Where evidence, though issuable, sustains the verdict, this court is without authority to set it aside where the trial judge has approved the finding.
 DECIDED JANUARY 12, 1943.
The defendant was convicted under Code § 26-2803 of embezzlement from the White Provision Employee's Credit Union. The defalcation was alleged to be $7550.53. The only issue is whether the evidence was sufficient to support the verdict. The evidence involved hundreds of entries and numerous documents, with much explanatory parol testimony. We can not see that a detailed statement of this testimony would be of any benefit either to the defendant or the public. The defendant was admittedly the secretary and treasurer of the credit union. The State's evidence showed that as such officer he had charge of the cash journal and of making the cash deposits and of keeping the deposit slips; that while others connected with the credit union made collections and certain entries on some of the records, such were done under the supervision of the defendant. When a check-up and audit of the affairs of the credit union began in October 1941 the shortage of $7550.53 was discovered. At that time it was also discovered that the cash which had been received and entered on the journal by the defendant had not been deposited, and that certain erasures and substitutions of entries had been made on the books of the credit union. It was developed that the shortage was discovered from records kept by persons other than the defendant, and when these records were compared and balanced they revealed the shortage. The substitutions in the erasures were in the handwriting of the defendant. The defendant admitted some of the erasures, and sought to explain them in a manner which will hereafter be related. *Page 744 
In the checking by the supervisory committee the discovery was made that certain of the records could not be found, whereupon the committee requested them of the defendant. He promised to produce them. Instead of returning with the documents thus requested he did not return, but sent a portion of the records to the committee by a messenger. He was then discharged. The auditor, who was employed to make an audit of the affairs of the credit union after the shortage had appeared to the supervisory committee from its investigation, testified that there was discovered a difference between the cash received and the cash deposited in the bank, and that by his audit he confirmed the shortage to the amount of $3462.01 for the fifteen months immediately preceding his audit. The alleged shortage also covered a period previous to that included within said auditor's report, and there was evidence to substantiate it.
The defendant made a lengthy statement covering approximately twenty-five pages of the record. He reviewed his situation from the time of his childhood, relating his lack of educational advantages, having been reared in the country with limited educational opportunities; his coming to Atlanta, being employed by the White Provision Company a number of years previously; his promotion with the company; his reluctant acceptance of the office of secretary and treasurer of the credit union; his lack of time and facilities and ability to look after the duties properly; his good faith in the discharge of the duties and his innocence of any wrongdoing. After leading up to the time where the investigation of the alleged shortage by the supervisory committee began, the gist of his defense, found in his statement, was as follows:
"I think probably the supervisory committee turned the investigation over to Mr. Jackson, who was office manager for White Provision at that time. And we did make arrangements with Mr. Jackson that afternoon that I would come out to White Provision on Sunday morning and work with him and members of the supervisory committee, and that I thought by working with them that I could point out these instances where I had credited various accounts with payments that I had not received, and where often-times I have had to run through profits that we had never made in order to pay dividends, and other mistakes that had been made in the carrying on of the credit union, that I could point out to *Page 745 
him a number of them, that the supposed shortage of the credit union was not money that had been taken out and used for my benefit, but was merely errors in the posting of the books, in the accounts themselves, and so I went out to White Provision Company on Sunday morning and on getting there I told Mr. Jackson and the members of the supervisory committee that my interest, I felt that my interest and their interest was the same, because any error that I could point out that could be collected would be for their advantage as much as it would be for mine, and that we were working toward the same aim.
"They were very nice to me and gave me the privilege of looking over such records as I asked for, and Mr. Gaines himself sat by my side and from time to time I would make such entries as I could find or recall from memory through looking, by looking through these records of transactions where I felt that we could make a collection from the individual who really owed the difference, and I looked and I found that record with this committee. I think on that particular day we were able to locate something around a thousand or better dollars that could very readily be collected from the individuals, yet I had run a credit through and taken the responsibility on myself, and this committee was very nice to me, but on one occasion, I don't know what caused it, Mr. Jackson sort of blew off the handle and told me that I was out there to help them and not to try to help myself. So again I told them that everything that I could do to help myself was not doing anything but helping them too, because anything that helped me, and I think they realized it, anything that helped me was going to help them, because any time that I could cut down the difference by showing them where they could collect, why, that was helping them as much as it was me. And so I worked with them until 5:30 that afternoon and offered to go out and work with them any other day or time that they might see fit.
"On the Monday following I called up Mr. Jackson himself and asked him had he, had they found anything and they said no, that they had not worked on the books any during the day. They were going to work on them that night. And I told him, I says, `Well, at any time that I can come out and be of any assistance to you I will be glad to, because I feel like that with the right kind of audit and my assistance I can prove to you that every penny of *Page 746 
the difference lies within the own records and I can show you where a large portion of it can be collected from the individuals.' And Mr. Jackson thanked me and said that he didn't see anything that I could do, and I didn't hear from him any more until January of this year when, just before the first time the case was called, I had the privilege of going out with the lawyers who represented the bonding company, and at that time I was shown the bond claim and Mr. Jackson says, `Well, now, can you show me ____' that bond claim by the way was composed of entries representing deposits to individuals' accounts over a certain period of time; I do not know the exact period, but everything on there represented a deposit, and he says, `Now, can you tell, point out this and that and tell me just what you done with it?' I told him no, it was impossible to tell just how any one or how any particular group of deposits was applied, because on that particular day I took something over $400 of losses and took quite a number of those deposit slips to offset that $400 entry that I had to run through the loan account, and it had to come off of the share account, and I told him that no one entry or any group of entries could be particularly identified against any other particular entry, because of the way in which it had to be twisted about in order to take care of the losses as they occurred. And then I asked him had they been able, through that list that I had furnished them in October, had they been able to make any collections that would reduce the amount of shortage, and he said they had collected from the insurance company the money for one of the loans. That was the large one, something over $300, but they had not done anything else about any of the others because the individual borrower had left the company. Well, that individual borrower had already left the company before I assumed the responsibility myself. Then he told me, he says, `That is just a drop in the bucket,' and says, `You are going to have to prove every damn cent of it in order to get out of this thing.' I told him that there was a large portion of it that I felt that I could point out by having the opportunity, but it would be almost impossible to point out every individual entry because I would have to do so from memory, and it run back over such a long period of years, because, as in the first part of my statement I said that I first discovered the discrepancy myself in 1936." *Page 747 
The defendant had testified that when he received the effects of the office of the credit union from his predecessor no audit was made, and that he soon thereafter discovered that the entries in the books were incorrect, and that according to the cash turned over to him and the bank records there was then a shortage of $800; that for fear his job with the company would be jeopardized, and his good standing prejudiced, he did not reveal this to any one; that he set about making entries and conducting the affairs of the credit union in a way to conceal it, hoping that the matter would work out for the benefit of all, as the credit union grew; but on account of the system of conducting the business the apparent shortage increased instead of decreased, from inadequate methods of bookkeeping, which necessitated erroneous entries and erasures for corrections; that his conduct throughout was in good faith to protect the interest of the credit union and his own good name, and that he had not converted any of the funds to his own use. The defendant produced a number of citizens of the highest type who testified as to his good character and his conservative mode of living.
The methods, revealed by this record, employed to conduct a credit union for the benefit and convenience of the employees, show a situation which the writer thinks should be corrected, but this is more of legislative than judicial concern.
The assignment of error is on the general grounds only. The evidence sustained the verdict.
Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.